Filed 3/16/23  In re A.A. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| In re A.A. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, Plaintiff and Respondent, v. T.R. et al., Defendants and Appellants. | E079241 (Super.Ct.No. RIJ2200182) OPINION |

APPEAL from the Superior Court of Riverside County.  Cheryl C. Murphy, Judge.

Affirmed in part and modified in part.

Elizabeth Klippi, under appointment by the Court of Appeal, for Defendant and Appellant T.R.

Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and Appellant M.W.

1

Minh C. Tran, County Counsel, and Teresa K.B. Beecham and Prabhath Shettigar, Deputy County Counsel, for Plaintiff and Respondent.

T.R. (mother) and M.W. (father) appeal from an order sustaining dependency jurisdiction over the mother's three daughters, the youngest of whom is also the father's. The order was based on the mother's mental illness and the father's failure to protect his daughter from the mother's mental illness.

We agree with the parents that there was insufficient evidence to support jurisdiction over the two older girls under Welfare and Institutions Code section 300, subdivision (b).[1]  Although the mother, when under stress, had paranoid delusions and was suicidal, the two older girls, aged 17 and 15, coped admirably.  Undoubtedly, they suffered emotionally.  However, when the mother's threats to kill herself caused the oldest girl to cut herself, the mother put her in therapy; her cutting behavior stopped.  Thus, there was no evidence of a substantial risk of serious physical injury to the two older girls.

The youngest girl, age 10, is a different story.  The mother's threats caused her to threaten to kill herself.  Neither the father nor the mother obtained therapy for her or did anything else to avert this substantial risk of serious physical injury.  As to her, therefore, we will affirm.

---

[1]     All further statutory citations are to the Welfare and Institutions Code.

2

# I

## MOOTNESS

While this appeal was pending, at the next review hearing, the juvenile court terminated jurisdiction. It returned the girls to the mother, and it gave the father visitation with his daughter — the status quo before the dependency was filed.

Accordingly, this appeal is moot. (See *In re D.P.* (2023) 14 Cal.5th 266, 276-278.) The parents, however, ask us to exercise our discretion to decide a moot case. (See *id*. at p. 282.)

The Supreme Court has listed several factors to be considered in deciding whether to entertain an appeal from a jurisdictional/dispositional order that has become moot. One of these is "why the appeal became moot." (*In re D.P.*, *supra*, 14 Cal.5th at p. 286.) "[W]here . . . the case becomes moot due to prompt compliance by parents with their case plan, discretionary review may be especially appropriate. . . . It would perversely incentivize noncompliance if mootness doctrine resulted in the availability of appeals from jurisdictional findings only for parents who are less compliant or for whom the court has issued additional orders. [Citations.] Principles of fairness may thus favor discretionary review of cases rendered moot by the prompt compliance or otherwise laudable behavior of the parent challenging the jurisdictional finding on appeal." (*Ibid*.)

This is precisely such a case. The record shows that, even in the brief time between the detention hearing and the jurisdictional/dispositional hearing, the parents promptly started getting their act together so they could regain custody of the girls. The

3

juvenile court's dismissal demonstrates that their "laudable behavior" continued. We therefore reach the merits, even though the appeal is technically moot.

II

STATEMENT OF THE FACTS

The following facts are taken from the evidence admitted at the jurisdictional/dispositional hearing.

A. *Family Structure*.

The mother has three daughters. Her ex-husband B.A. (absent father) is the father of Aa.A. (Aa.) and I.A. (I.) When this dependency was filed, they were 17 and 15, respectively. At all relevant times, the absent father's whereabouts were unknown.

The father is the father of Am.W. (Am.), who was 10 when this dependency was filed. The mother and father were never married; they were living together when Am. was born, but they separated later. The father visited the girls regularly and treated all three of them as his own.

B. *Prior Child Welfare History*.

In 2011, the mother and the absent father were reported to the Department of Public Social Services (Department) for "[g]eneral [n]eglect," allegedly consisting of a filthy house, lack of food, domestic violence, the mother's use of marijuana while pregnant, and "the mother's behavior change." The Department investigated and concluded the allegations were "[u]nfounded."

4

In 2017, the mother was reported to the Department for "[p]hysical [a]buse and [e]motional [a]buse." The mother allegedly told Am., more than once, that "she hated her, did not want her, and threatened to send her to live with her father or place her for adoption." She also allegedly hit I. with a belt and dug in her nails while grabbing I.'s arm, causing "broken skin or a red mark." The mother admitted hitting I. with a belt and asking if she wanted to live with her father. The Department closed the case as unfounded; it concluded that the actions that were substantiated were "inappropriate" but did not rise to the level of abuse.

In August 2021, the mother was reported to the Department for "[g]eneral [n]eglect and [e]motional [a]buse." Am. "disclosed suicidal ideations. She wanted to hurt herself because the mother threatened to commit suicide and blamed the minors. The mother kicked the minors out of the home." The father took the girls to an aunt's home.

When interviewed, "[t]he mother did not accept any responsibility that her actions significantly contributed to the children's mental health issues. She referred to the girl's cutting behavior as them [*sic*] following trends. She spoke about the children in negative ways. She portrayed herself as a victim of her children's negative behaviors. She called the children bullies and described them as taking advantage of her. She did not remember the content of what she said."

5

The mother agreed to "get herself and the children into therapy" through differential response (DR) services.[2] She signed a consent form for DR services. She said later that she called the service provider but did not get a call back.

The referral was closed as "[i]nconclusive."

C.     *The November 2021 Incident.*

On November 4, 2021, according to a reporting party, there was an argument between the mother and Aa. When Aa. left to go to school, the mother reported her to the police as a runaway. The mother then went to Aa.'s school, where she screamed at Aa., calling her a "slut" and a "whore" and "accus[ing] her of wanting to have sex with boys."

After school, the father arrived to pick up the girls and take them to buy school supplies. The mother did not want him to take them; she said if they left with him, they could not come back home. The girls therefore asked for their belongings. The mother said, "Fuck you!" and slammed the door. They knocked on the door and tried to phone her, but she did not respond. The father could not house the girls in his rented room, so he took them to stay with the maternal grandparents.

The reporting party was concerned that the mother was using methamphetamine. "Last year, the mother had lost 70 lbs, and her skin and teeth looked bad. The mother also disclosed that she had been prescribed Adderall, Prozac, and Xanax. The mother

---

[2]     DR services are voluntary services provided in situations that do not call for the filing of a dependency. (See <https://www.cdss.ca.gov/inforesources/child-welfare-protection/differential-response>, as of Mar. 14, 2023.)

had psychotic episodes; she believed people lived in the walls and watched her. She believed that the KKK would kill her. The mother went into the attic to cut wires because she thought there were cameras and microphones in the home. She took away the girls' keys to the home because she thought people were making copies of the keys."

When a social worker tried to interview the mother, she became irate, screaming and yelling. She accused the social worker of "not being a real social worker" because she had arrived in an unmarked vehicle. She yelled at the neighbors across the street, even though the neighbors were not present. The social worker "de-escalated the situation"[3] and produced a business card. However, the mother said, "My children are fine and are well taken care of, and I am not going to tell you where they are at."

On Thanksgiving, the girls returned home to the mother. In December 2021, when the social worker learned that they had gone back home, she had the police do a welfare check. Am. was with the father, but Aa. and I. were at home; they said "they were fine in the mother's care." The police reported that they "appeared adequately cared for."

D.    *Further Investigation in February 2022*.

On February 4, 2022, the case was assigned to a new social worker. That same day, she visited the home, accompanied by two police officers. The maternal grandmother was there; she had come to stay with the family, at the mother's request, "for help and support."

---

[3]    At some point, the social worker called the police, and they responded to the home.

The girls confirmed that, in November 2021, after an argument with Aa., the mother had "kicked [them] out," and the father had taken them to the maternal grandparents. Aa. said they came home because they missed the mother.

The girls reported that, in an argument with the maternal grandmother three days earlier, the mother had said she wanted to die. All three girls agreed that this was "normal behavior" for the mother.

Aa. admitted having cut herself once, on the legs and thighs, a year earlier. Thereafter, the mother put her in therapy, and she felt she had benefited from it. She did not consider the mother saying that she wanted to die to be "a problem," as the mother had not carried out her threats. However, she also said that her "home life," including the mother saying she wanted to die, had contributed to her cutting herself. In the past, she said, the mother had had visual and auditory hallucinations. The mother did not use drugs or alcohol. When stressed, she would "isolate" in her room.

Aa. felt "everyone in the home would benefit from therapy . . . ." In her opinion, the mother would not be "receptive" to therapy for herself, but if the girls wanted therapy, she would "advocate" for them.

Am. said that, in 2021, she wanted to hurt herself. She started seeing a school counselor, and she did not think about hurting herself anymore. However, the mother saying that she wanted to die "ma[de] her worried and stressed."

The maternal grandmother admitted that the mother was concerned that people were watching her, and that she had cut wires in the attic; however, this was "cautious and protective," because the mother had in fact been threatened.

The mother, when interviewed, denied the allegations. She denied any drug use; however, she was vaping with what the social worker believed to be a methamphetamine pipe.[4] She said she wanted therapy, but she refused to sign consent forms or to participate in team meetings. She said that, in August 2017, she had agreed to DR services because she felt coerced to do so, to close the referral. She said she had tried to participate in DR services; she had called the provider, but the provider had never called back.

During the interview, according to the social worker, the mother "had difficulty staying calm, was fidgety, had slurred speech, and talked rapidly." She began screaming and using profanity.

On February 17, 2022, the maternal grandmother returned to her home, out of state. She said the mother had gotten a new job and was doing well. She denied any concerns.

On February 23, 2022, the father said the girls were safe in the mother's care; he would intervene if he were concerned about their safety. Since the November 2021

_____

[4] This seems unlikely, as two police officers were present. In fact, while you can smoke meth with a vape pipe, it would seem physically impossible to vape with a meth pipe. But the point is moot, as the petition did not allege substance abuse.

incident, he had moved to his mother's home, and Am. could live with him there, but he did not believe that was necessary.[5] He added that, at the time of the November 2021 incident, "the mother was dealing with stress and depression after losing her job of [12] years."[6] She had since gotten a new job, and she no longer seemed depressed. He had no concerns about her mental health. He had visits with the girls every other weekend. They told him there had been no more "heated verbal altercations."

E.  *The Initiation of the Dependency*.

At this point, the Department filed a dependency petition. When the detention warrant was served on the mother,[7] she "became verbally abusive and aggressive and started using profanities." She accused the Department of fabricating the warrant (because the magistrate's signature was illegible) and of kidnapping the girls. She threatened to sue the county and the social worker. She called the police and refused to leave until they responded.

---

[5]     The Department says the father "transported A[m]. for relatives to care for her, even though he has space for the child at his residence." Not so. In November 2021, he had to take the girls to relatives because he was living in a rented room. By February 2022, he had moved in with his mother, so Am. could live with him. This would seem to be good parenting.

[6]     The father said the mother had held the job for either 13 or 15 years. According to her, it was 12.

[7]     Apparently the mother was not present when the girls were detained. On learning of the detention, she went to the Department and demanded to see them. The warrant was served on her then and there.

When detained, Aa. accused the social worker "of ruining their lives, asking where [she] was when they needed [her] to help them in 2021. Aa[.] said things have been good at home and asked to be left alone. She said . . . the decision to remove them from the mother's care was unnecessary and traumatic for all three of them. She started using profanities, and said [the social worker] was not helping her or her sisters."

At the detention hearing, the juvenile court returned all three girls to the mother. The mother consented to a mental health and medication assessment. The juvenile court ordered "an immediate referral for family therapy."

F.      *Further Interviews in March 2022*.

In March 2022, the case was assigned to a new social worker. She conducted further interviews.

The girls agreed that the mother had a history of depression, anxiety, paranoia, and suicidal ideation. Aa. said the last time the mother had had paranoid delusions was a year earlier, and the last time she had had suicidal ideation was over two months earlier. She believed the mother needed a "proper diagnosis."

Aa. also said, "We all have a mental illness and need help." Aa. was in therapy and had been for roughly two years. She did not believe the mother was the "catalyst" for her needing therapy. Am. was not in therapy.

Aa. said the mother did not neglect her safety. Nothing like the November 2021 incident had happened since.

11

I. said the mother needed help for her mental illness. She had had episodes — most recently in December 2021 — in which "she thought people were following her or listening to her conversations." Once, when the girls told her they were at theater practice, she did not believe them. In I.'s opinion, in the November 2021 incident, the mother was having an "episode." The mother had said "Fuck you" to the father; however, she had never called I. "slut" or "whore." I. felt safe at home.

Am. said the mother had a history of using profanity but had not done so since the November 2021 incident. The mother's last "episode" had been in December 2021. She used to take medication but stopped because she did not like the way it made her feel. Am. said "her mom never neglects her and her dad leaving her with her mom was not a mistake."

The father said that back in March 2020, the mother's behavior changed; she thought people were following her. She saw a therapist, but she did not take her prescribed medication, because it made her feel like a zombie.

He believed the mother might once have said something "inappropriate" to Aa. when Aa. was trying to see her boyfriend. She also said "Fuck you," in the heat of the moment during an argument; however, she had never called the girls "slut" or "whore."

The mother admitted a history of depression and anxiety. "[H]er depression and personal issues built up in 2020 to mid-2021." Back in April 2021, she started individual and group therapy, and it helped, but it ended when she lost her job in July 2021. At some point, "she had a brief relationship with a man who caused her to think she was

12

being stalked." She had a new job driving for Uber and Lyft. She felt she no longer needed therapy.

In the November 2021 incident, she and Aa. got into an argument because Aa. wanted to ditch school to "do something." She was concerned about Aa.'s unsupervised visits to her boyfriend's house. She may have accused Aa. of wanting to "fuck" or "mess around with" her boyfriend. She may have said, "You can leave," but she did not mean leave forever. When Aa. "stormed off," the mother followed her to school and called police. "When asked what she believes her family's needs are, [the mother] indicated she needed to follow the court orders."

G.     *Subsequent Social Workers' Visits*.

In April 2022, the social worker visited the home. The girls seemed fine and said things were going well. Despite the provider's repeated failures to return her calls, the mother had managed to schedule mental health assessments for herself and Am.

In May 2022, the social worker visited the home again. Again, the girls said things were going well, and they had no concerns. The social worker "did [not] have any concerns about [Am.] being in mother's care[.]" At the end of May, Am. completed a mental health assessment and started therapy.

The social worker reported that the mother had made "moderate progress" in her services. She had had a negative drug test. She had also completed a mental health assessment.

H.    *The Mother's Mental Health Assessment*.

According to the mental health assessment, the mother "has anxiety and stress related to current open CPS case. She had some anxiety in past for which she received therapy. Based on her reports her current anxiety is not impacting her physiological function or ability to interact with others or her work." "She is able to [use] coping skills like deep breathing exercise[s] and journaling to manage her stress. Her reported symptoms are not severe enough at this time to require treatment with medication. She will benefit with individual therapy to manage her anxiety and stress."[8]

I.    *Testimony at the Jurisdictional/Dispositional Hearing*.

The social worker conceded that, by the time of the hearing, the father was "almost like a non-offending parent." Moreover, "[the mother] followed through so far for individual therapy and for Am[.]'s therapy." The mother was not in family therapy

---

[8]    The Department faults the mother for "not shar[ing] any of the reports from juvenile court [with the assessing psychiatrist]. . . . [T]he trial court ordered the mental health professionals copies of the Department's reports, so they know what the issues really are."

There is no indication that the mother knew or should have known that she should share the reports. She testified that she did not give the reports to Am.'s therapist, because the therapist did not ask for them. Moreover, juvenile court records are confidential. (§ 827, subd. (a).) It is not clear whether the assessing psychiatrist came within the exception for a "court-appointed evaluator" (§ 827, subd. (a)(1)(L)); the juvenile court had ordered a mental health assessment, but it had not specifically appointed the psychiatrist. How was the mother to know when we are unsure?

At the end of the jurisdictional/dispositional hearing, at the request of Am.'s counsel, the juvenile court did order that the reports be given to Am.'s therapist, but no one claimed that the mother should have provided them sooner.

yet, but only because of a paperwork error by the Department. However, the mother had been "resistant" to individual therapy for Am. Specifically, she said "she didn't see why Am[.] had to have services if she didn't want them." The social worker was concerned that "if there's no involvement [Am.'s] therapy would not continue . . . ."

The mother testified that, in the August 2021 incident, a friend had broken up with Am.; Am. said, "If you won't be my friend, I'm going to kill myself . . . ." The school counselor did not feel it was a genuine threat. The mother talked to Am. about it; she told her the threat was a serious matter and should not be made "loosely." The mother agreed to participate in DR services and signed a consent form. The social worker never got back to her, even after the mother called and left a message.

In November 2021, a different social worker walked up to her and asked to speak to the girls. The social worker could not produce a badge or other identification. She seemed unaware of the previous social worker. The mother therefore declined to tell her where the girls were. In December 2021, when the police did a welfare check, they told the mother the case had been closed.

Aa. had graduated from high school, magna cum laude, with a 4.33 GPA. She had been named "student of the year, most inspirational student." She was going to a Cal State University on a merit scholarship. She had been honored by the City of Riverside. I. was involved in color guard, band, and theater. Am. was getting A's and B's.

The mother did not think she had said anything suicidal for six months. She did not remember saying she wanted to die in February 2022; if she did, she meant it,

15

"loosely, like I'm so frustrated I could just die." She agreed that she should not say it in front of Am.

The mother believed she would benefit from therapy. She was willing to go without Department involvement. She agreed that she felt "forced" to go to therapy.

The mother had obtained therapy for Aa. in March 2019, because Aa. was "withdrawn." Aa. was still in therapy.

Am. was also still in therapy, "for generalized anxiety." The mother denied being resistant to therapy for Am.; she was "very pro therapy." However, she also testified: "I don't understand why she needs therapy, no one has answered that yet." She admitted asking why Am. had to have therapy if she did not want to, but only for clarification, because she thought children under 12 could not be forced into therapy against their will. When the social worker told her to put Am. in therapy, she complied. Am. told her "she enjoyed her last visit, and she wants to do it." The mother was "supportive." She was going to go to family therapy with Am. once a month. She could continue Am.'s therapy through Medi-Cal.

The father testified that he communicated with the mother every day, by text, phone, and/or in person. He visited the home at least four times a week, and Am. stayed with him four days a week. He had no concerns about the girls being in the mother's care. He had taken them away before, and if he thought they were not being well cared for, he would take them away again.

After the November 2021 incident, he asked the girls "all the time" how the mother was doing; they said she was fine. In part IV.C, *post*, we discuss the evidence as to whether the father knew that the mother had threatened to kill herself.

III

STATEMENT OF THE CASE

In March 2022, the Department filed a dependency petition as to the three girls. It alleged failure to protect (§ 300, subd. (b)), in that:

"b-1 The mother suffers from unresolved mental health issues, to include symptoms of depression, suicidal ideations, and psychotic episodes, and she has failed to obtain/maintain regular treatment and/or medications to address her mental health needs. Further the mother's mental health negatively impacts the children as the children, Aa[.] and Am[.], are participating in mental health services due to the mother's behaviors.

"b-2 The mother neglects the health, safety, and well- being of the children as [she] has told them to leave the home, is verbally abusive, calling them inappropriate names including but not limited to 'slut' and 'whore' and telling them 'fuck you.'

"b-3 The father . . . knew or reasonably should have known that the mother's mental health was a concern and he failed to intervene in the protection of his child, Am[.], as he left the child in the care of the mother, placing the child at risk of serious injury, neglect, and/or abuse."

As to the absent father, it also alleged failure to protect and failure to support (§ 300, subd. (g)).

Aa. and I. were detained and placed with the maternal grandmother; Am. was detained from the mother only and placed with the father.

At the detention hearing, contrary to the Department's recommendation, the juvenile court returned the girls to the parents (except that it detained Aa. and I. from the absent father).

In June 2022, at the jurisdictional/dispositional hearing, the juvenile court found all allegations of the petitions true. It ordered family maintenance services for both the mother and the father. It returned physical custody to the parents (though it removed custody from the absent father). It authorized the Department to apply ex parte to terminate the dependency.

IV

THE SUFFICIENCY OF THE EVIDENCE

TO SUPPORT THE JURISDICTIONAL FINDINGS

The parents contend that the jurisdictional findings as to them were not supported by substantial evidence.

A.    *Legal Background.*

Under section 300, subdivision (b)(1), the juvenile court has jurisdiction based on failure to protect when:

"The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of any of the following:

18

"(A) The failure or inability of the child's parent or guardian to adequately supervise or protect the child.

"(B) The willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left. [¶] . . .

"(D) The inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness . . . ."[9]

"[S]ection 300 does not require that a child actually be abused or neglected before the juvenile court can assume jurisdiction. [Subdivision (b) and other] subdivisions . . . require only a 'substantial risk' that the child will be abused or neglected. The legislatively declared purpose of these provisions 'is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children *who are at risk of that harm*.' [Citation.] 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' [Citation.]" (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

---

[9] The version of section 300 that was in effect in 2022 was formatted differently, but it was not substantively different in any relevant respect. (Stats. 2021, ch. 98, § 1.)

19

"While evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances *at the time of the hearing* subject the child to the defined risk of harm. Thus, previous acts of neglect, standing alone, do not establish a substantial risk of future harm; there must be some reason beyond mere speculation to believe they will reoccur. [Citation.]" (*In re Emily L.* (2021) 73 Cal.App.5th 1, 15.)[10]

"Although section 300 requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing [citations], the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child. [Citations.] The court may consider past events in deciding whether a child presently needs the court's protection. [Citations.] A parent's "'[p]ast conduct may

---

[10] As the father helpfully notes, a minority of courts hold that where the child "has suffered" serious physical harm, there is no need to prove "a substantial risk that the child will suffer" serious physical harm. (*In re Adam D.* (2010) 183 Cal.App.4th 1250, 1261; *In re J.K.* (2009) 174 Cal.App.4th 1426, 1434-1438.) Here, arguably, Aa. had already suffered serious physical injury. However, at the time of the hearing, section 300, subdivision (b)(1) further provided that "[t]he child shall continue to be a dependent child pursuant to this subdivision only so long as is necessary to protect the child from risk of suffering serious physical harm or illness." (Former § 300, subd. (b)(1), Stats. 2021, ch. 98, § 1.)

Effective January 1, 2023, the Legislature renumbered former section 300, subdivision (b)(1) by splitting it into three subdivisions, (b)(1), (b)(2), and (b)(3). The quoted language now appears at the end of subdivision (b)(3). However, there is no indication that the Legislature intended to change the meaning of "this subdivision" so as to limit its application to subdivision (b)(3) rather than, as before, to all of subdivision (b).

20

be probative of current conditions" if there is reason to believe that the conduct will continue.' [Citations.]" (*In re Cole L.* (2021) 70 Cal.App.5th 591, 601-602.)

Jurisdiction need only be proven by a preponderance of the evidence. (§ 355, subd. (a); *In re J.S.* (2021) 62 Cal.App.5th 678, 685.)

"'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.] '"[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate]."' [Citation.]" [Citation.]' [Citation.]" (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.)

"The existence of a mental illness is not itself a justification for exercising dependency jurisdiction over a child. [Citation.] 'It cannot be presumed that a mother who is proven to be [mentally ill] will necessarily be detrimental to the mental or physical well-being of her offspring. There are innumerable eccentric parents whose behavior on certain occasions may be less th[a]n socially acceptable and yet they are

21

loving and compassionate parents. Conversely, there are parents who always exhibit socially acceptable behavior publicly, but whose children have parent-induced psychological and emotional problems their entire lives.' [Citation.]" (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 563-564.)

B.     *Application to the Mother.*

The only physical abuse shown was that, in 2017, the mother hit I. with a belt and dug her nails into I.'s arm. At the time, the Department concluded, correctly, that this was not serious physical harm and did not show a substantial risk of serious physical harm. There was no evidence that, over the following five years, the mother did anything similar.

In March 2020, according to the father, the mother's behavior changed. She reported feeling increasing stress and anxiety. In July 2021, she lost the job she had held for 12 years, as well as the access to therapy that came with it. This was obviously a destabilizing event. In its wake, she began saying that she wanted to die or to kill herself. Twice, in August and December 2021, she kicked the girls out of the house. However, this did not pose a risk of serious physical harm to the girls. Both times, the father took them to a relative's home. By the time of the jurisdictional/dispositional hearing, the father was living with his mother and would take the girls in, if necessary.

The mother also suffered from paranoid delusions. Again, however, there was no evidence that this posed a risk of serious physical harm to the girls. (See *In re*

*Matthew S.* (1996) 41 Cal.App.4th 1311, 1319 [mentally ill mother's delusions were insufficient to support finding under section 300, subd. (b)].)

Moreover, in February 2022, the mother had gotten a new job. This appeared to mitigate her symptoms considerably. Both I. and Am. said she had not had an "episode" since December 2021. Admittedly, in March 2022, she claimed the detention warrants were fabricated and the new social worker was not really a social worker. She explained, however, that the judge's signature on the warrants was illegible (which it was), and that the new social worker arrived in an unmarked car and was unable to produce official identification. While this shows a level of suspicion verging on the paranoid, it was not completely unfounded or delusional. And again, it showed no risk of serious physical harm to the girls.

There is no evidence that she had any delusions thereafter. The mental health assessment diagnosed her as suffering from stress and anxiety, but not schizophrenia or paranoia.

The only evidence of any risk of physical harm to the girls was that Aa. had cut herself and Am. had threatened to kill herself. The juvenile court very appropriately focused on this evidence.[11] Preliminarily, however, this evidence did not support jurisdiction over I. I. had shown no tendencies to suicide or self-harm. She wanted

---

[11]    In addition to the b-1 allegation, based on mental illness, the juvenile court also found true the b-2 allegation, based on verbal abuse and telling the girls to leave the home. This was error, as there was no substantial evidence that this created a risk of physical harm, by causing the girls to be suicidal or to self-harm or otherwise.

family therapy, but unlike Aa. and Am., she did not want individual therapy. There was no evidence that I. was at any risk of physical harm.

Although Aa. said the mother was not the "catalyst" for her cutting herself, she also said that her "home life," specifically including the mother saying she wanted to die, had contributed to her cutting herself. The mother, however, had gotten therapy for Aa., on her own, without any intervention by the Department. Aa. was still in therapy and felt she had benefited from it. She had not cut herself since. There was no evidence that the mother would not follow through on the therapy that she herself had gotten for Aa.

Am. was a different matter. Am. told a social worker that "[s]he wanted to hurt herself because the mother threatened to commit suicide and blamed the minors." In 2017, the mother had told Am. that "she hated her, did not want her, and threatened to send her to live with her father or place her for adoption." In August 2021, she kicked Am. and her sisters out of the house. It is reasonably inferable that this all contributed to Am.'s wanting to hurt herself.

The social worker reported that the mother "spoke about the children in negative ways," "portrayed herself as a victim," and "did not accept any responsibility that her actions significantly contributed to the children's mental health issues."

The mother did consent to DR services, including therapy for herself and for the girls. The juvenile court found that her consent was genuine, and that her failure to

participate in DR services was not her fault.[12]  Nevertheless, she made no effort to get

therapy for herself or for Am.  Meanwhile, she continued to make threats to kill herself.

Also, she kicked the girls out of the house again in November 2021.

At the time of the hearing, the mother still took no responsibility for Am.'s need

for therapy.  She attributed Am.'s threat to kill herself to a breakup with a friend.  She

also minimized it, saying the school counselor told her it was merely "a statement made

in the heat of a passionate plea."  Rather than deal with Am.'s underlying distress, the

mother merely warned her not to make such threats "loosely."

It is true that, in February 2022, Am. said she no longer wanted to hurt herself;

however, she also said that the mother's threats to kill herself "ma[de] her worried and

stressed."  When Am. started therapy in May 2022, it was for "generalized anxiety," not

specifically for suicidality or self-harm.  Even so, it was inferable that, unless Am. and

the mother both got therapy, the mother would threaten to kill herself again, making Am.

want to hurt herself again.

Finally, the juvenile court reasonably found a significant risk that the mother

would not follow through on therapy for herself and for Am.  She had been in therapy, so

she knew she needed it, yet after she lost her job, she apparently made no effort to get it

---

**12**      Specifically, it found:  "Certainly it does appear that mother was willing to participate and had signed a release.  Mother testified that she did believe that individual counseling and family counseling were beneficial.  [¶]  It may be that mother did not have the right resources to commence services that were identified back in August.  Mother did testify that she followed up — tried to follow up and did not receive return calls from the Department."

again.  She stopped taking her prescribed medication.  When she got a new job, she decided she no longer needed therapy.  She agreed to DR services, including therapy, only because she felt coerced.  She refused to sign consent forms for therapy.  According to Aa., the mother was not "receptive" to therapy for herself.  While she testified that she was "pro therapy," she also said she felt "forced" into it.  She did not feel she needed therapy.

Similarly, she still did not understand why Am. needed therapy.  She showed that she was resistant to therapy for Am. by asking why Am. had to have therapy when she did not want it.  Although she put a different spin on this remark at the hearing, the juvenile court did not have to accept it.

The mother argues that it was "speculative" that she would not follow through on therapy, citing *In re Joaquin C.*, *supra*, 15 Cal.App.5th 537.  There, the appellate court said:  "The evidence . . . does not support the juvenile court's assertion that [the mother] refused mental health treatment.  [The mother] agreed to therapy as soon as [the social worker] told her it had been recommended by the upfront assessment.  She completed her initial telephone assessment the same day as the [team] meeting . . . .  She soon began going to therapy, and even when she declined other services she wanted to continue and did continue therapy. . . .  [The mother] did not want to see a psychiatrist, but that she did so nonetheless; and . . . she promptly began taking the psychotropic medications her psychiatrist prescribed."  (*Id*. at pp. 564-565.)

By contrast, here, as discussed, there was ample evidence that the mother was resistant to therapy for herself and for Am. Indeed, although the social worker conceded that the mother had "followed through so far for individual therapy," this seems to mean only that she had obtained a mental health assessment. She had not actually started family therapy (although this was partially the fault of the Department), and there was no evidence that she had actually started individual therapy.

We therefore conclude that the juvenile court erred by finding jurisdiction over Aa. and I. based on the mother's failure to protect; however, it properly found jurisdiction over Am. on this basis.

C.     *Application to the Father*.

"[N]egligent conduct . . . will support section 300, subdivision (b) dependency jurisdiction. [Citations.]" (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 993.) Accordingly, it is crucial to determine what the father knew or should have known. (See *In re M.W.* (2015) 238 Cal.App.4th 1444, 1455-1456 [insufficient evidence that allowing children access to father, despite his criminal history, supported jurisdiction under § 300, subd. (b), where mother did not know his criminal history].)

Sometime before March 2019, Aa. cut herself. In August 2021, Am. threatened to kill herself. However, there is no evidence that the father knew about either incident.

The father did know that in March 2020, the mother's behavior changed, and she began having paranoid delusions. He also knew that in July 2021, she lost her job, and as a result, she was "dealing with stress and depression."

27

The juvenile court found that the father also knew about the mother's threats to kill herself. He does not specifically argue that there was insufficient evidence to support this finding. Nevertheless, because it is crucial to the analysis, we examine the relevant evidence carefully.

The father testified:

"Q. Did the girls ever tell you that they heard their mother say she wanted to die?

"A. Um, not necessarily. They heard her talking to herself about they don't — about said conversation over the phone. So I don't really think they really knew what she was referring to when she said that statement."

He followed up with all three girls "about those statements." Am. "said sometimes I hear Mom say some things." He asked her what kind of things. He did not remember what she said. Aa. "doesn't really talk that much about what's going on with Mom." He asked I., "How is Mom?," and she said, "She's good."

The juvenile court could reasonably take this as a grudging admission. Essentially, he admitted that the girls had heard the mother talking about killing himself, and that they told him this. He merely questioned whether the girls "really knew what [they were] referring to." He also admitted asking Am. what kind of things the mother said. It is inferable that she told him exactly what the mother said, and that his claim that he did not remember what she said was an evasion.

Admittedly, there is no evidence that the father knew that the mother's threats to kill herself had caused Aa. or Am. to be suicidal or to self-harm. Thus, he had no reason

28

to know that the mother's threats posed a substantial risk of serious *physical* harm to the girls. The statute, however, requires only that (1) the parent has not adequately supervised or protected the child, and (2) as a result, the child is *in fact* at substantial risk of serious physical harm. The juvenile court could properly reason that a reasonable parent who was aware of the mother's threats would have followed up on them — by asking the girls specifically about the effect that the threats had on them, by trying to get the mother and/or the girls into therapy, or even by seeking full custody. His failure to do anything at all left Am. at a substantial risk of serious physical injury.

The father argues that "to the extent Am[.] may have been at risk, the danger had long since passed by the time of the June 2022[] jurisdiction hearing." However, as we held with respect to the mother, there was a significant risk that the mother would not follow through on therapy for herself and for Am. Absent therapy for both, Am. was still at risk. And from the father's very denial of this risk, the juvenile court could infer that he would not intervene to protect Am.

Accordingly, the juvenile court properly found jurisdiction over Am. based on the father's failure to protect.

V

PARENTING CLASSES

The father also contends that the juvenile court erred by ordering him to complete a parenting class.

29

A.     *Additional Factual and Procedural Background.*

In its reports for the jurisdictional/dispositional hearing, the Department recommended that the father be required to complete a parenting class. It reported that, when interviewed in March 2022, he had agreed to do so.

At the jurisdictional/dispositional hearing, the social worker explained, "So when we initially offer services, what my supervisor had asked us to do is go ahead and offer a parenting program for him at this time and then to find out how the case proceeded, so that is what we did . . . ." The father testified that he did not feel he needed a parenting class.

At the end of the hearing, the juvenile court approved the case plan "as written" and ordered "the parents [to] participate in family maintenance services . . . as specified in the family's case plan."

The father's counsel objected to a parenting class, because "the worker testif[ied] he's a non-offending parent." The juvenile court responded, "I will direct the Department to provide an updated case plan for both mother and father . . . . I'm not sure it's necessary for him to do a parenting program. There might be other services that could benefit him."

The minute order of the hearing says, "The [c]ase [p]lan is approved as written." "The Department is directed to provide updated case plans for . . . father . . . with any changes."

B.    *Discussion.*

"If a child is adjudged a dependent child of the court, on the ground that the child is a person described by Section 300, and the court orders that a parent or guardian shall retain custody of the child subject to the supervision of the social worker, the parents or guardians shall be required to participate in child welfare services or services provided by an appropriate agency designated by the court." (§ 362, subd. (c); see also § 300.2, subd. (a) [child protection may include "provision of a full array of social and health services to help the child and family and to prevent reabuse of children"].)

"'"'The juvenile court has broad discretion to determine what would best serve and protect the child's interests and to fashion a dispositional order accordingly. On appeal, this determination cannot be reversed absent a clear abuse of discretion." [Citation.]' [Citation.]" (*In re Daniel B.* (2014) 231 Cal.App.4th 663, 673 [challenge to order to participate in support group as part of family maintenance services].)

The Department argues that the father's contention is "not ripe," because the juvenile court ordered the Department to update the case plan. Nevertheless, it approved the case plan as written and ordered the father to participate in it. He remained under that obligation unless and until the juvenile court approved an updated case plan. No party has claimed that it ever did so.

The father had not lived with Am. for years, if ever. Although he visited regularly and had visitation with Am., the mother was her primary caregiver. The juvenile court could reasonably require him to take a parenting class, if only to ensure that he was a

31

viable alternative placement — as the social worker put it, to "offer a parenting program for him at this time and then to find out how the case proceeded . . . ."

In addition, as we held in part IV.C, *ante*, the father knew that Am. had heard the mother threaten to kill herself, and he failed to protect her from the adverse effect of these threats. It is reasonable to conclude that a parenting class would give him skills to listen better, to assess risk better, and to protect Am. better.

We therefore conclude that it was not an abuse of discretion to order the father to completed a parenting class.

VI

DISPOSITION

The true finding on the b-1 allegation is stricken with respect to Aa. and I. and affirmed with respect to Am. The true finding on the b-2 allegation is stricken. The true finding on the b-3 allegation is affirmed.

The true findings on the b-4 and g-1 allegations against the absent father stand or fall on whether the b-1 and b-2 allegations against the mother are true as to Aa. and I. (See *In re Anthony G.* (2011) 194 Cal.App.4th 1060, 1065 [failure to support].) Because we are striking the true findings on the latter, the true findings on the former are also stricken.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ

P.J.

32

We concur:

CODRINGTON
J.

SLOUGH
J.